COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-05-329-CV

 

 

IN THE INTEREST OF E.L.R., 

 

J.A.N., AND A.M.P., CHILDREN                                                             

 

                                              ------------

 

            FROM
THE 393RD DISTRICT COURT OF DENTON COUNTY

 

                                              ------------

 

                           MEMORANDUM
OPINION[1]

 

                                              ------------

I. Introduction








Appellant Briget R. appeals
the trial court=s order
terminating her parental rights to her three children, E.L.R., J.A.N., and
A.M.P.   In four points, Briget argues
that the evidence is legally and factually insufficient to support the trial
court=s order of termination based on its findings that she knowingly
allowed the children to remain in endangering surroundings and engaged in
endangering conduct.  We affirm.

II. Factual and Procedural
Background

Briget is married to Jose
Luis R.  On June 5, 1994, she gave birth
to her oldest son, E.L.R.  Although she
thought that Jose Luis was E.L.R.=s father, a paternity test later revealed that E.L.R.=s father was Abel N., a man with whom Briget had a brief
relationship.  Later in 1994, Briget
began a relationship with Juan N., with whom she had J.A.N., her second son, on
January 25, 1996.  

In July 1998 Briget was first
referred to Child Protective Services (CPS) due to an allegation that she
threatened to drive her car with her children in it into an 18-wheeler.  Guardianship proceedings were initiated by
her mother and stepfather, and E.L.R. and J.A.N. were subsequently sent to live
with Briget=s mother. 

In the summer of 1999, Briget
regained custody of her children, but she was referred to CPS again later that
year because of an allegation that she hit E.L.R.  Between August 2000 and June 2001, Briget was
referred to CPS two more times due to allegations that she had physically
abused J.A.N.

Sometime in 2001, Briget
began a relationship with Norberto Malagon P. On January 11, 2002, they had a
daughter, A.M.P., Briget=s third
child.








In early March 2004, in
response to a report from J.A.N.=s school that J.A.N. was expressing suicidal thoughts because of
problems at home, CPS sent an investigator, Michelle Hiza, to interview J.A.N.
and E.L.R., and to investigate Briget=s residence.  On March 25, 2004,
Hiza spoke with Briget, and Briget explained that she had problems and felt
overwhelmed; that she did not know what to do with her children or how to help
them; that her children were difficult to take care of; that she had been off
of her medications for a while; and that she was depressed and had thoughts of
suicide.  That same day, Briget wrote a
statement expressing similar feelings.  

On March 29, 2004, the trial
court allowed the Texas Department of Family and Protective Services (the
Department) to remove E.L.R., J.A.N., and 
A.M.P. from Briget=s home and
set a hearing regarding conservatorship and termination of the parent-child
relationship.  After a four-day trial,
the trial court found

by
clear and convincing evidence that termination of the parent-child
relationships between [Briget] and [the children is] in the children=s
best interest.

 

[The
court also found] by clear and convincing evidence that [Briget] has 

 

knowingly
placed or knowingly allowed the children to remain in conditions or
surroundings which endanger the physical or emotional well-being of the
children;

 








engaged
in conduct or knowingly placed the children with persons who engaged in conduct
which endangers the physical or emotional well-being of the children.[2]  

 

The trial court appointed the Department as
managing conservator for E.L.R. and A.M.P., and appointed Juan Bustamante N.,
J.A.N.=s father, as his managing conservator. 
The trial court rendered judgment terminating Briget=s parental rights to the children and this appeal followed.  

III. Standards of Review








A parent=s rights to Athe
companionship, care, custody, and management@ of his or her children are constitutional interests Afar more precious than any property right.@[3]  AWhile parental rights are of constitutional magnitude, they are not
absolute.  Just as it is imperative for
courts to recognize the constitutional underpinnings of the parent-child
relationship, it is also essential that emotional and physical interests of the
child not be sacrificed merely to preserve that right.@[4]  In a termination case, the
State seeks not just to limit parental rights but to end them permanentlyCto divest the parent and child of all legal rights, privileges,
duties, and powers normally existing between them, except for the child=s right to inherit.[5]
 We strictly scrutinize termination
proceedings and strictly construe involuntary termination statutes in favor of
the parent.[6]

In proceedings to terminate
the parent‑child relationship brought under section 161.001 of the family
code, the petitioner must establish one ground listed under subdivision (1) of
the statute and must also prove that termination is in the best interest of the
child.[7]  Both elements must be established;
termination may not be based solely on the best interest of the child as
determined by the trier of fact.[8]









        Termination of parental rights is a
drastic remedy and is of such weight and gravity that due process requires the
petitioner to justify termination by clear and convincing evidence.[9]  This intermediate standard falls between the
preponderance standard of ordinary civil proceedings and the reasonable doubt
standard of criminal proceedings.[10]   It is defined as the Ameasure or degree of proof that will produce in the mind of the trier
of fact a firm belief or conviction as to the truth of the allegations sought
to be established.@[11] 








The higher burden of proof in
termination cases elevates the appellate standard of legal sufficiency review.[12]  The traditional no-evidence standard does not
adequately protect the parent=s constitutional interests.[13]  In reviewing the evidence for legal
sufficiency in parental termination cases, we must determine whether the
evidence is such that a factfinder could reasonably form a firm belief or
conviction that the grounds for termination were proven.[14]  We must review all the evidence in the light
most favorable to the finding and judgment.[15]  This means that we must assume that the
factfinder resolved any disputed facts in favor of its finding if a reasonable
factfinder could have done so.[16]  We must also disregard all evidence that a
reasonable factfinder could have disbelieved.[17]  We must consider, however, undisputed
evidence even if it is contrary to the finding.[18]  That is, we must consider evidence favorable
to termination if a reasonable factfinder could, and disregard contrary
evidence unless a reasonable factfinder could not.[19]









This higher burden of proof
also elevates the appellate standard of factual sufficiency review.[20]  A[A] finding that must be based on clear and convincing evidence cannot
be viewed on appeal the same as one that may be sustained on a mere
preponderance.@[21]  In considering whether the
evidence of termination rises to the level of being clear and convincing, we
must determine whether the evidence is such that a factfinder could reasonably
form a firm belief or conviction that the grounds for termination were proven.[22]  Our inquiry here is whether, on the entire
record, a factfinder could reasonably form a firm conviction or belief that the
parent violated section 161.001(1)(D) or (E).[23]  

The distinction between legal
and factual sufficiency lies in how we review the evidence.[24]  In a factual sufficiency review, in
determining whether the evidence is such that a factfinder could reasonably
form a firm belief or conviction that its finding was true, we must consider
whether disputed evidence is such that a reasonable factfinder could not have
resolved it in favor of the finding.[25]  If, in light of the entire record, the
disputed evidence that a reasonable factfinder could not have credited in favor
of the finding is so significant that a factfinder could not reasonably have
formed a firm belief or conviction in the truth of its finding, then the
evidence is factually insufficient.[26]

IV. Endangering Conduct








We first review Briget=s third and fourth points, in which she complains that the evidence is
both legally and factually insufficient to support the trial court=s finding that she engaged in conduct or knowingly placed the children
with persons who engaged in conduct which endangers the physical or emotional
well-being of the children under section 161.001(1)(E) of the family code.[27]  

Under section 161.001(1)(E),
the relevant inquiry is whether evidence exists that the endangerment of the
child=s physical well‑being was the direct result of the parent=s conduct, including acts, omissions, or failures to act.[28]
Endangerment under this section must be based on more than a single act or
omission; a voluntary, deliberate, and conscious course of conduct by the
parent is required.[29]  It is not necessary, however, that the parent=s conduct be directed at the child or that the child actually suffer
injury.[30]  








To determine whether
termination is necessary, courts look to parental conduct both before and after
the child=s birth.[31]  A parent=s past endangering conduct may create an inference that the parent=s past conduct may recur and further jeopardize a child=s present or future physical or emotional well-being.[32]








Mental illness of a parent
alone is not grounds for terminating the parent‑child relationship;
however, if a parent=s mental
state causes her to engage in conduct that endangers the physical or emotional
well‑being of a child, that conduct can be considered in a termination
proceeding.[33]  This conduct includes a parent=s attempts to commit suicide.[34]  In addition, conduct that subjects a child to
a life of uncertainty and instability also endangers the child=s physical and emotional well‑being.[35]

The record contains the
following evidence of Briget=s endangering conduct:

A.  Briget=s Mental Health 

The record
shows that Briget has an extensive history of psychological problems, which she
has been unable to effectively treat. 
Briget was raised in a violent and unstable family; she was first
hospitalized at the age of twelve for attempting suicide, hospitalized again
when she was fifteen years old, and, in total, has spent about five years in
and out of psychiatric institutions.  She
was diagnosed as Bipolar II and has spent most of her life on and off medications
to treat that disease. 








At trial, Briget admitted
that she was not stable at the time when guardianship proceedings were
initiated by her mother and stepfather in 1998. On March 25, 2004, after CPS
conducted a home investigation, Briget submitted the following written
statement:  AI am emotionally unstable at this time to take care of my kids.  I=m very confused.  I just started
2 [weeks] ago on my medications for bipolar.@  Briget also told the CPS
investigator that she was depressed and had thoughts of suicide.  Briget mentioned suicide again at a later
date when she was speaking to a CPS case worker in the CPS parking lot.  

In May 2004, after her children
were removed, Briget was evaluated by a psychologist, Dr. Mark Foster.  Dr. Foster noted that Briget=s thinking was cloudy, her reasoning was not sound, and she had
difficulty staying on tasks.  These facts
indicated to him that she was either not taking her medications or not
responding well to them.  Based on his
examination, he provided the following psychological snapshot of Briget to the
trial court:

This seems to be an individual that has some
problems thinking clearly.  This is an
individual that is going to have . . . a history of unstable relationships,
difficulty managing their emotions, particularly feelings such as anger[,]. . .
. poor impulse control[,]  . . .
difficulty learning from past mistakes; that is, I would expect that she will
have to repeat the same mistakes many, many times  before she learns from her mistake.  That there is a very strong inclination
towards, if something bad happens, to push it out of consciousness . . .
quickly and try to get life back to normal as fast as possible.

 

This is not somebody that=s
going to cope with just day-to-day daily stress very well; . . . the challenges
of living in our modern world are going to present more difficulties in terms
of coping than for most people, considerably more.

 

Because there is a strong orientation to avoid
looking at problems . . . with self-examination, these are persons that
typically don=t
benefit a great deal in counseling or psychotherapy. 

 








B.  Educational and Special
Needs of the Children 

The record
shows that Briget was unable to care for the children=s educational and special needs. 
Both E.L.R. and J.A.N. were diagnosed with language delay, and had
developmental and behavioral problems. 

Specifically, in 1997 when
E.L.R. was three years old, Johnnie Pettigrew, a diagnostician with Denton ISD,
diagnosed him with language delay, a speech impairment, and global
developmental delay.  Pettigrew noted
that one of the strongest causes of global development delay was the lack of
interaction between a child and a parent and that Briget=s depression might have caused her to withdraw from E.L.R.  By the age of four, E.L.R. was still not
potty-trained and drank from a bottle. 
E.L.R. was subsequently diagnosed with ADHD.

In 1999, Pettigrew also
diagnosed J.A.N. when he was three years old. 
Although J.A.N. had some language delay, articulation errors, and
behavioral problems, his problems were not as severe as E.L.R.=s. 








In 2000, when J.A.N. was four
years old, Martha Mendoza was assigned to be his home intervention instructor
through a Home Instruction for Parents with Preschool Youngsters program.  Mendoza=s job was to go to J.A.N.=s home once each week to teach Briget how to work effectively with J.A.N.
Mendoza did not have success with Briget, however, because Briget kept
cancelling appointments and refused to participate in the weekly activity
assignments for J.A.N.=s
benefit.  As a result, Mendoza obtained
permission to work one-on-one with J.A.N., and do the weekly activities with
him herself.    During the next two years that Mendoza worked with J.A.N. at home,
she noticed that Briget did not discipline any of her children, that they did
not listen to her, that she could not control E.L.R., and that the children Adid whatever they want[ed].@  Mendoza also noticed that the
family was not clean, the home was always messy, and that the home smelled of
Briget=s cigarette smoke to the extent that the smell got on Mendoza=s clothes.  Although J.A.N.
eventually began to obey Mendoza and progress, he would not listen to
Briget.      In
October 2000, Rhonda Boaz, a case management counselor with Mental Health
Mental Retardation (MHMR), began working with E.L.R.  During the seven months she worked with
E.L.R., Boaz found Briget to be resistant to out-of-home placement for E.L.R.
and inconsistent in bringing him to MHMR for treatment.  

While E.L.R. attended Riviera
Elementary School in 2002, Pettigrew observed inappropriate exchanges, or
fighting, between E.L.R. and his mother in the hallway.  On one occasion, E.L.R.=s resource room teacher had to physically restrain him because he put
himself and another child in danger.  








In the fall of 2003, two or
three weeks into the school year, Briget enrolled E.L.R. and J.A.N. in Newton
Rayzor Elementary School.  After a few
weeks at the new school, E.L.R. began to have angry outbursts in the classroom
and became violent, noncompliant, and out of control.  He hit the other children without
provocation, and on one occasion, he threw a chair.  A behavioral intervention plan was
implemented for E.L.R. but was discontinued two and a half weeks later after
E.L.R. attacked one of the instructional aides. 
On October 1, 2003, E.L.R was sent to a school called Evers Park, which
had teachers that are specially trained to work with children with special
needs. 

During that same time in
2003, Briget would frequently bring A.M.P. to Newton Rayzor with her when she
had to visit the school.  Although A.M.P.
was one and a half years old, she never spoke; she was always dressed in only a
diaper, was dirty, and had a runny nose. 
One of the staff members at Riviera Elementary noted that when Briget
would bring A.M.P. to school with her, A.M.P. always sat on the floor beside
her mother or on her mother=s lap and had no interaction with anyone, and that her behavior did
not seem age-appropriate.  








E.L.R.=s attendance at Evers Park was interrupted on January 15, 2004, when
he was sent to Millwood Psychiatric Hospital after exhibiting explosive
behavior at home.  At that time, E.L.R.
was diagnosed with major depressive disorder, intermittent explosive disorder,
ADHD, a possible bipolar condition, and prescribed new medications.  

After E.L.R. returned to
Evers Park, he often came to school dirty and very tired and fatigued.  He exhibited extreme mood swings, such that
the school nurse suspected that Briget was not administering E.L.R.=s medicine properly.  The nurse
explained these problems to Briget, but Briget failed to correct them.  And although the nurse offered to give E.L.R.=s medications to him at school, Briget refused.  

On one occasion in February
2004, the staff at Evers Park had difficulty awakening E.L.R., so they took him
into the nurse=s office to
let him sleep for a few hours.  After he
woke up, E.L.R. called Briget from the school, but she said she could not pick
him up because she did not have a working car. 
E.L.R. then became agitated and had to be restrained.  The school contacted Briget multiple times
during the day, but she stated that she was unable to retrieve E.L.R.  E.L.R. continued to be aggressive and
combative, ultimately throwing a glass bowl across the conference room.








On March 3, 2004, E.L.R.
exhibited violent behavior on the school bus. 
He was removed from the bus by two social adjustment class aides,
restrained, and put into a time-out room. 
Because Briget still did not have a car, a police officer picked her up
from her house and brought her to the school to discuss the incident.  Briget indicated to the Evers Park nurse that
she often relied on the police for transportation and to discipline her
children.

During the same 2003-2004
school year, J.A.N. was in the second grade. 
By the end of the school year, however, there was some question as to
whether he would move on to the third grade because he had been absent from
school forty-eight days and tardy ninety-two days that year.  In fact, Briget was subsequently convicted
for the absences by a truancy court.  

On March 12, 2004, J.A.N.
came to school with his mother and he was very upset.  J.A.N. told the school staff that the night
before, E.L.R. had thrown him against a television and had hit Briget.  J.A.N. said that he wanted to kill himself because
he was tired of Athis whole
thing@ and that his mother did not do anything about it.   

C.  Negligent Supervision

The record contains evidence
showing that Briget was unable to properly supervise her children.  In 2001, Briget made numerous calls to the
police regarding her children; she made two reports that E.L.R. assaulted her,
six reports that he had run away, one report that another child had assaulted
him, and one report that he was defiant and uncontrollable. 








On September 1, 2002, when he
was eight years old, E.L.R. was hit by a car in his apartment complex=s parking lot.  On November 22
of the same year, J.A.N. was hit by a car. 
As a result, J.A.N. was in a full body cast, temporarily unable to walk,
and bedridden for a month and a half. Approximately four months after J.A.N.=s accident, his cousin almost hit him with her car when he crossed a
street without looking.  

Another time after J.A.N.=s accident, Briget called J.A.N.=s cousin at midnight and told her that J.A.N. had run away.  J.A.N.=s cousin and aunt got up and started to search for J.A.N. in the
neighborhood.  Briget then called them
back to say that he had returned home. 
J.A.N.=s cousin
then went over to Briget=s house and
saw J.A.N. sitting on the sofa, crying and yelling that he wanted his father. 

Some time later, J.A.N.=s cousin received another call from Briget that J.A.N. had run away
from the Dollar Store and she was afraid he would get hit by a car again.  When his cousin went to the Dollar Store to
help Briget, however, she did not find Briget or any of the children there. 

D. CPS=s Investigation and Removal of the Children








On March 22, 2004, after
J.A.N. had told the school staff about his suicidal thoughts, Hiza, a CPS
investigator, went to J.A.N.=s school to investigate the situation. 
She interviewed J.A.N. and he told her that he wanted to kill himself
because E.L.R. was mean to him, that he frequently thought about suicide, that
E.L.R. hit him frequently, that E.L.R. had thrown him into a television, and
that his mother was aware of E.L.R.=s behavior towards him.

Hiza also interviewed E.L.R.
at his school the same day.  E.L.R. did
not admit that he hit J.A.N., but he did say that J.A.N. agitated him.  E.L.R. said that he watched his little
sister, A.M.P., and that he disciplined her by spanking her, as he had seen his
mother do.  He also told Hiza that his
aunt had punched him in the face and kicked him in the stomach. 

Hiza then went to Briget=s residence, and at the time all three children were there.  All of the children were dirty, and their
clothes were filthy.  A.M.P. had a thick
layer of dirt on her and her hair was greasy. 

Although Hiza was at the
residence for almost two hours, she never heard A.M.P. speak.  A.M.P. threw continual fits, however; throughout
the entire visit, A.M.P. pinched her mother, threw herself on the ground,
kicking and screaming, and repeatedly hit the family cat in a mean way.  According to Hiza, Briget did not have
control over the situation. 

E.L.R. and J.A.N. were
outside playing for most of Hiza=s visit.  Briget never went
outside to check on them while Hiza was there. 
Just before Hiza left, E.L.R. and J.A.N. came inside the apartment
fighting, both complaining that the other had hit him, and after J.A.N. told
his mother what had happened, he punched the family cat.  








On March 29, 2004, the
Department removed the children from Briget=s home.  At trial, Briget
admitted that she did not feel like she was a fit parent at that time.

E.  Events After Removal

After the
children were removed, Briget was allowed to visit with J.A.N. and A.M.P. on a
weekly basis.  Out of forty-four possible
visits, Briget either cancelled or failed to appear sixteen times.  On the first visit Briget had with the
children, A.M.P. did not acknowledge Briget, and then A.M.P. started screaming,
and continued to scream or cry for most of the visit.  The foster care agency was concerned about
A.M.P.=s reactions to the visits with her mother and noticed that A.M.P. had
more temper tantrums and problems after the visits.   

A typical visit for Briget,
J.A.N., and A.M.P. involved setting out and eating food that Briget had
brought.  Briget would tell J.A.N. to sit
down and eat, but he would not listen to her. 
Although Briget would tell J.A.N. not to listen to his music until after
he had eaten, he would disobey her request and she would not reprimand
him.  Often no one in the room would
interact with one another.  In addition,
it was not unusual for Briget to Azone out@ or stare
off into space for ten minutes at a time. 









In May 2004, Briget told J.A.N.
at one of their visits that she had gotten him a puppy.  Over the next couple of months, they talked
about the dog during their visits; they even named the dog.  J.A.N. wanted Briget to let the dog come live
with him and his father, with whom he was living at the time, but Briget
refused.  In December 2004, J.A.N. asked
about the dog and Briget told him that it had gotten too big and she had sent
it to the pound.  

After E.L.R. was removed from
Briget=s home, he was taken to a residential treatment center in Lubbock,
Texas.  Although E.L.R. still had
behavioral problems at the time of trial that would make it difficult for any
person to parent him, he was beginning to show signs of improvement and gain
some pride in himself.   

After J.A.N.=s removal, he went to live with his father, Juan N.  Although J.A.N. would not initially obey his
father, by the time of trial, he was following his father=s rules.  Numerous witnesses
identified that J.A.N.=s behavior
greatly improved after he began living with his father, he seemed much happier,
had a better attitude, and was much cleaner; his peers no longer avoided him
because of his smell, and his self-esteem was better as a result.  He was punctual and had better attendance at
school; his grades were improving and he appeared cared-for. 








After A.M.P. was removed from
Briget=s residence, she was placed in a foster home.  Jennifer Gradante, the treatment director for
the foster agency, first saw A.M.P. within a few days of her placement.  At the time, A.M.P. had just turned two years
old.  Gradante described A.M.P. as unable
to react to noises or her environment, 
that she appeared Acatatonic,@ and that she was well outside the normal limits; Gradante could move
A.M.P. into different positions and A.M.P. would stay in them.  Gradante opined that multiple things, such as
various forms of abuse and neglect, could have caused A.M.P.=s reactions.  By the time of
trial, however, A.M.P. had progressed in terms of age-appropriate developmental
tasks but was still very delayed with her adaptive skills for her environment.  The CASA volunteer who visited with A.M.P. noted
that A.M.P. had bonded with two of the other foster girls, that she followed
them around, and that she laughed and smiled. 

In August 2004, approximately
four months after the children=s removal, a CASA volunteer and the children=s attorney ad litem made an unannounced visit to Briget=s home.  The house was dirty,
filled with bugs, and trash was everywhere. 
The dog Briget had promised J.A.N. was locked in the boys= room, and there was dog urine and feces all over the floor in that
room as well as other areas of the home. 









Applying the appropriate
standards of review to the evidence in this case, we hold that the evidence
that Briget was unable to effectively manage her own mental health problems,
that she was unable to meet the educational needs of her children or tend to
their special needs, that she negligently supervised her children, and that she
failed to maintain a clean living environment for her children both before and
after their removal is both legally and factually sufficient to show that
Briget engaged in a voluntary, deliberate, and conscious course of conduct that
endangered the physical and emotional well-being of her children.  Therefore, the evidence is legally and
factually sufficient to support the trial court=s finding of endangerment under section 161.001(1)(E), and we overrule
Briget=s third and fourth points.[36]








V. Conclusion

Having
overruled each of Briget=s
dispositive points on appeal, we affirm the trial court=s judgment.         

PER CURIAM

 

PANEL F: 
CAYCE, C.J.; DAUPHINOT and HOLMAN, JJ.

 

DELIVERED: 
April 5, 2007

 

 











[1]See Tex. R. App. P. 47.4.





[2]The
trial court also terminated Jose Luis=s parental rights to the
children, Abel N.=s
parental rights to E.L.R., and Norberto Malagon P.=s
parental rights to A.M.P. for other reasons. 
None of these parties, however, appealed the order of termination.





[3]Santosky
v. Kramer, 455 U.S. 745, 758-59, 102 S. Ct. 1388, 1397
(1982); In re M.S., 115 S.W.3d 534, 547 (Tex. 2003). 





[4]In re
C.H., 89 S.W.3d 17, 26 (Tex. 2002).





[5]TEX. FAM. CODE ANN. '
161.206(b) (Vernon Supp. 2007); Holick v. Smith, 685 S.W.2d 18, 20 (Tex.
1985).  





[6]Holick, 685
S.W.2d at 20-21; In re E.S.S., 131 S.W.3d 632, 636 (Tex. App.CFort
Worth 2004, no pet.).





[7]TEX. FAM. CODE ANN. '
161.001 (Vernon Supp. 2007); In re J.L., 163 S.W.3d 79, 84 (Tex. 2005). 





[8]Tex.
Dep=t of
Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex. 1987).





[9]TEX. FAM. CODE ANN. ''
161.001, 161.206(a); In re J.F.C., 96 S.W.3d 256, 263 (Tex. 2002).  





[10]In re
G.M., 596 S.W.2d 846, 847 (Tex. 1980); In re K.W., 138 S.W.3d 420,
425 (Tex. App.CFort
Worth 2004, pet. denied).





[11]Tex. Fam. Code Ann. '
101.007 (Vernon 2002).





[12] In
re J.F.C., 96 S.W.3d at 265.





[13]Id.





[14]Id. at
265-66.





[15]Id. at
266.





[16]Id.





[17]Id.





[18]Id.





[19]City
of Keller v. Wilson, 168 S.W.3d 802, 827 (Tex. 2005).





[20]In re
C.H., 89 S.W.3d at 25.





[21]Id.





[22]Id. 





[23]Id. at
28. 





[24]J.F.C., 96
S.W.3d at 266.





[25]Id.





[26]Id.





[27]See TEX. FAM. CODE ANN. '
161.001(1)(E).





[28]In re
R.D., 955 S.W.2d 364, 368 (Tex. App.CSan Antonio 1997, pet.
denied); Dupree v. Tex. Dep't of Prot. & Regulatory Servs., 907
S.W.2d 81, 83‑84 (Tex. App.CDallas 1995, no writ). 





[29]TEX. FAM. CODE ANN. '
161.001(1)(E); In re D.T., 34 S.W.3d 625, 634 (Tex. App.CFort
Worth 2001, pet. ref=d);
In re K.M.M., 993 S.W.2d 225, 228 (Tex. App.CEastland
1999, no pet.).





[30]Boyd, 727
S.W.2d at 533.   





[31]In re
D.M., 58 S.W.3d 801, 812 (Tex. App.CFort Worth 2001, no pet.).





[32]See
id. at 813.





[33]See
In re C.M.B., 204 S.W.3d 886, 895 (Tex. App.CDallas
2006, pet. filed); Carter v. Dallas County Child Welfare Unit, 532
S.W.2d 140, 141‑42 (Tex. Civ. App.CDallas 1975, no writ); see
also In re C.D., 664 S.W.2d 851, 853 (Tex. App.CFort
Worth 1984, no writ) (a parent=s mental condition and
suicide attempts are factors to consider in determining whether the parent
engaged in endangering conduct). 





[34]See
In re A.M.C., 2 S.W.3d 707, 716 (Tex. App.CWaco
1999, no pet.) (finding endangerment from mother=s
suicidal thoughts, suicide attempts, and neglect).





[35]See
In re S.D., 980 S.W.2d 758, 763 (Tex. App.CSan
Antonio 1998, pet. denied).





[36]When
multiple grounds for termination are alleged, only one predicate finding under
section 161.001(1) is necessary to support a judgment of termination.  In re A.V., 113 S.W.3d 355, 362 (Tex.
2003).  Because we hold that Briget
engaged in conduct that endangered the physical or emotional well-being of her
children under section 161.001(1)(E), we need not address the remaining
statutory ground for termination that was found by the trial court.